**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Michael J. Dunn, being sworn, state under oath as follows:

**Agent Background**

1.      I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since 2008.  Since April 2023, I have been assigned to the DEA New Hampshire office.  Prior to that, I was assigned to the New England Field Division's Cross Border Initiative, which is a Task Force incorporating federal, state, and local law enforcement agents.  Prior to my employment as a DEA Special Agent, I was employed as a police officer with the Nashua, New Hampshire Police Department for over six years.

2.      As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received significant training in the field of narcotic investigations and enforcement. Based on my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in drug trafficking, including how drug traffickers distribute, store, and transport drugs, and collect, transport, and launder drug proceeds.

3.      I have participated in all aspects of drug investigations, including physical surveillance, the coordination and supervision of undercover transactions, the execution of search warrants and arrest warrants, and the debriefing of defendants, informants, and witnesses with personal knowledge regarding drug trafficking.  I have also reviewed numerous recorded communications regarding drug trafficking, and analyzed significant amounts of data from telephone, financial records, and drug records.

4.      Since approximately November 2023, I have been one of the lead agents investigating the individuals discussed in this affidavit.

**Purpose of the Affidavit**

5.  I submit this affidavit in support of an application for a criminal complaint charging Ranfis Rodolfo Garcia Pena ("GARCIA"), Jorge Joel Gomez Guzman ("GOMEZ"), ███████ ███████████████████████████, with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846.

6.  I am familiar with the facts and circumstances of the investigation described herein based on my personal participation in this investigation and based on information obtained from sources that I believe to be reliable. The information summarized in this affidavit is included for the limited purpose of establishing probable cause to issue the requested criminal complaint, and I have not included all information known to me about this investigation or these individuals. My interpretations of conversations, conduct, and events detailed herein are based on my training, experience, and knowledge of this investigation. All times herein are approximate.

**Probable Cause**

7.  Since at least November 2023, the DEA has been engaged in an investigation into drug trafficking by GARCIA and his co-conspirators (which include but are not limited to GOMEZ ███████). The DEA's investigation has used an individual designated herein as "CS-1," who has personally interacted with GARCIA, GOMEZ, ███████ as described below. For witness safety reasons, identifying information about CS-1 is not included in this affidavit. I believe CS-1 to be reliable.[1]

---

[1] The identity of CS-1 is known to me and other investigators in this case. CS-1 does not have any criminal convictions. CS-1 is assisting law enforcement in this investigation in exchange for monetary compensation. CS-1 has assisted law enforcement in other investigations, including an investigation that led to the seizure of large quantities of drugs and a federal prosecution of another target. Investigators believe information provided by CS-1 to be reliable.

8.      As summarized below, starting in November 2023, CS-1 communicated with GARCIA via a mobile phone assigned number ▮▮▮▮▮▮▮ (the "Target Telephone"). Between November 2023 and June 2024, GARCIA used the Target Telephone to coordinate at least four drug deliveries to CS-1.[2]  The four controlled purchases discussed in this affidavit show that GARCIA, GOMEZ, ▮▮▮▮▮▮▮ conspired to distribute controlled substances.

9.      <u>First Controlled Purchase – November 14, 2023: GARCIA arranged, and GOMEZ delivered, approximately 170 grams of methamphetamine to CS-1.</u>  On November 13, 2024, I directed CS-1 to contact GARCIA at the Target Telephone number. CS-1 was previously familiar with GARCIA and had previously purchased drugs from GARCIA. In summary, during this call, in lightly coded language, CS-1 asked GARCIA if he would sell CS-1 one pound of methamphetamine, and GARCIA stated that he would, for the price of $2,500. The parties agreed to conduct this deal the following day.

10.     On the afternoon of November 14, 2023, investigators went to a secure location with CS-1, where CS-1's person and vehicle were searched for drugs, contraband, and currency with negative results.[3]  At approximately 2:29 p.m., I directed CS-1 to place a WhatsApp call to GARCIA at the Target Telephone. GARCIA did not answer, but called back from the Target

---

[2]  I am aware of CS-1 making multiple other controlled purchases from GARCIA after these four deals—GARCIA used co-conspirators other than GOMEZ ▮▮▮▮▮▮▮ to deliver the drugs in those subsequent deals. Those other controlled purchases are not discussed herein to maintain the confidentiality of the ongoing investigation into uncharged targets.

[3]  Investigators employed these protocols during all controlled purchases discussed in this affidavit. In addition to the searches described above, at the conclusion of each controlled purchase, investigators met with CS-1, searched CS-1 and his vehicle, retrieved the suspected narcotics that GARCIA and/or his coconspirators had sold to CS-1, and retrieved the audio-video recording from the vehicle that captured parts of these transactions. Unless otherwise noted, investigators followed these protocols for each controlled purchase. Therefore, I have not described or repeated these protocols separately for each controlled transaction.

Telephone at approximately 2:36 p.m. GARCIA stated that an associate named "Joel Gomez" would be delivering half a pound of methamphetamine.[4] During a subsequent call with the Target Telephone at approximately 2:43 p.m., GARCIA mentioned to CS-1 that GARCIA tried to obtain a full pound of methamphetamine but was only able to get half a pound.

11. Under surveillance by investigators and equipped with an audio-video recording device and official funds to purchase the drugs, CS-1 traveled to the pre-arranged meeting location to purchase the half pound of methamphetamine. At approximately 3:28 p.m., an individual later identified as GOMEZ through Registry of Motor Vehicles and law enforcement records—consistent with the "Joel Gomez" name given by GARCIA—appeared at the meet location in a white Honda Accord bearing Massachusetts registration plate 4JBL98 (the "Honda Accord"). Investigators observed GOMEZ exit the Honda Accord and enter CS-1's vehicle. I have reviewed the audio-video recording from CS-1's vehicle and the recording clearly shows GOMEZ's face as he enters CS-1's vehicle to make the delivery of drugs that CS-1 had negotiated with GARCIA.

12. Based on a subsequent debriefing of CS-1 and as corroborated by the audio-video recording, once in the Honda Accord, GOMEZ gave CS-1 the suspected drugs and CS-1 gave

---

[4] This call with the Target Telephone was not recorded due to a malfunction on the recording equipment, although I personally observed this call being made. Many of the other calls summarized in this affidavit were recorded. The calls that were not recorded were corroborated through phone records and/or surveillance. Each of the calls summarized in this affidavit is supported by credible evidence that is personally known to me and other investigators working on this case.

I further note that I am using the terms "call" or "calls" to describe any type of voice communications with the Target Telephone. Many of these calls were WhatsApp calls to the Target Telephone, as opposed to traditional phone calls.

Lastly, I note that many of the communications between CS-1 and the Target Telephone (e.g., phone calls, WhatsApp calls, WhatsApp messages) were in Spanish. To the extent possible, investigators have reviewed rough translations of these communications.

GOMEZ the funds that the DEA had provided to CS-1 for this transaction.  While in the vehicle, in lightly coded language, GOMEZ also told CS-1 that they (presumably referring to GARCIA and others) had attempted to get a full pound of methamphetamine but could only get a smaller amount, and that they primarily had access to fentanyl instead of methamphetamine.

13. Investigators later determined that the drugs that GOMEZ had delivered to CS-1 only weighed approximately 168 grams.  On November 15, 2023, at my direction, CS-1 contacted GARCIA and informed him that half a pound is approximately 226 grams, which is what CS-1 had paid for, but the amount CS-1 received was only 168 grams.  The parties discussed GARCIA making up the difference in the next drug purchase that CS-1 would make from GARCIA.

14. The drugs that GARCIA had coordinated to sell, and that GOMEZ had delivered to CS-1 on November 14, 2023, were sent to a DEA drug laboratory for chemical analysis.  The lab results showed that the analyzed substance weighed approximately 170.1 grams and contained methamphetamine hydrochloride, determined to be approximately 100% in purity.  Methamphetamine is a controlled substance.

15. <u>Second Controlled Purchase – January 18, 2024: GARCIA arranged, and ▓▓▓▓ delivered, approximately 150 grams of fentanyl and fentanyl analogue to CS-1.</u>  On January 17, 2024, I directed CS-1 to again contact GARCIA at the Target Telephone number.  CS-1 had multiple recorded calls with GARCIA (who was using the Target Telephone) on that day.  In summary, CS-1 and GARCIA agreed to conduct a fentanyl pill[5] deal the following day at a Lowe's hardware store in Salem, New Hampshire.  The parties negotiated a price of $2.50 per

---

[5] CS-1 requested fentanyl pills, in part, based on GOMEZ's statements during the first controlled buy, described above, that the group he was working with primarily had access to fentanyl instead of methamphetamine.

fentanyl pill, and GARCIA agreed to sell 1000 pills for $2,500. CS-1 reminded GARCIA of GARCIA's debt from the prior drug deal during which GARCIA (and GOMEZ) had provided a lesser amount of methamphetamine than had been agreed upon. The parties agreed that GARCIA would provide an additional 200 pills (*i.e.,* 1,200 total) to account for the prior deal.

16. On January 18, 2024, CS-1 again had multiple communications with GARCIA on the Target Telephone. At approximately 12:41 p.m., GARCIA told CS-1 that he was sending a courier to the China Buffet, which was a short distance from the Lowe's and up Route 28, just across the border in Methuen, Massachusetts. A short while later, GARCIA called CS-1 and stated that his courier took an Uber to the China Buffet and was wearing an orange sweater, and asked CS-1 to go pick up that person. Investigators met with CS-1 and prepared CS-1 for this controlled purchase in the manner described above.

17. Investigators surveilled CS-1 as he traveled to the China Buffet. At approximately 1:11 p.m., investigators observed a man matching the description of GARCIA's courier—later identified through RMV records as ▇▇▇—walking in the area. ▇▇▇ was also determined to be the registered owner of the Honda Accord that GOMEZ was driving for the first sale coordinated by GARCIA. CS-1 picked up ▇▇▇. I have reviewed the audio-video recording from CS-1's vehicle and the recording clearly shows ▇▇▇ face as he enters CS-1's vehicle to make the delivery of drugs that CS-1 had negotiated with GARCIA.

18. According to CS-1 and the audio-video recording, once in the vehicle, ▇▇▇ handed CS-1 a plastic bag with the pills. CS-1 asked how many pills and ▇▇▇ replied "1,200." CS-1 handed ▇▇▇ the $2,500 in funds that the DEA had provided CS-1 for this drug deal, and ▇▇▇ counted the money. ▇▇▇ then exited the vehicle. Investigators subsequently observed a vehicle that appeared to be an Uber or similar rideshare

6

company pick ▆▆▆▆ up. Investigators followed that vehicle back to the same address in Lawrence, Massachusetts where GOMEZ had returned after completing the first sale.

19. The pills that GARCIA had coordinated to sell, and that ▆▆▆▆ had delivered to CS-1 on January 18, 2024, were sent to a DEA drug laboratory for chemical analysis. The lab results showed that the analyzed bag contained approximately 1,183 pills, which weighed approximately 151.8 grams total, and which were found to contain fentanyl and p-fluorofentanyl. Fentanyl and p-fluorofentanyl (which is an analogue of fentanyl) are controlled substances.

20. <u>Third Controlled Purchase – February 1, 2024: GARCIA arranged, and ▆▆▆▆ delivered, approximately 88 grams of fentanyl and fentanyl analogue to CS-1.</u> On January 31, 2024, CS-1 was again directed to contact GARCIA at the Target Telephone number. The parties agreed to meet the following day for a drug sale.

21. On February 1, 2024, at approximately 11:45 a.m., CS-1 placed a phone call to GARCIA at the Target Telephone number. In sum and substance, the parties negotiated a sale of 800 fentanyl pills for $2,000. The two agreed to meet at a location in Methuen, Massachusetts. Investigators met with CS-1 and prepared CS-1 for this controlled purchase in the manner described above.

22. At approximately 12:30 p.m., CS-1 texted GARCIA and indicated that he was 15 minutes away. Given the prior identifications of the address in Lawrence where GOMEZ and ▆▆▆▆ had returned after the first two buys, in the leadup to this buy, investigators had set up surveillance at that location. Shortly after CS-1 informed GARCIA that he was close, investigators observed ▆▆▆▆ exit from the address in Lawrence they were observing (where GOMEZ and ▆▆▆▆ had returned after the prior buys). Investigators then observed

███████ enter the Honda Accord parked at that location, and investigators followed ███████ as he drove from Lawrence to the deal location in Methuen.

23. At approximately 12:56 p.m., investigators observed ███████ arrive at the pre-arranged meeting location in the Honda Accord. After parking next to CS-1's vehicle, ███████ exited the Honda Accord and entered CS-1's vehicle. I have reviewed the audio-video recording from CS-1's vehicle and the recording clearly shows ███████ face as he enters CS-1's vehicle to make the delivery of drugs that CS-1 had negotiated with GARCIA.

24. According to CS-1 and the audio-video recording, once inside the vehicle, ███████ provided CS-1 with the bag containing the suspected fentanyl pills and CS-1 provided ███████ with the funds that the DEA had provided CS-1 to complete this transaction. After the deal was completed, investigators followed the Honda Accord as it again returned to the known location in Lawrence.

25. The pills that GARCIA had coordinated to sell, and that ███████ had delivered to CS-1 on February 1, 2024, were sent to a DEA drug laboratory for chemical analysis. The lab results showed that the analyzed bag contained approximately 833 pills, which weighed approximately 88.3 grams, and which were found to contain fentanyl and p-fluorofentanyl.

26. <u>Fourth Controlled Purchase – June 10, 2024: GARCIA arranged and delivered approximately 43 grams of fentanyl and fentanyl analogue to CS-1.</u> On June 10, 2024, under the direction of investigators, CS-1 again contacted GARCIA at the Target Telephone number via WhatsApp messenger and exchanged multiple messages. In sum and substance, the two negotiated a deal for 400 fentanyl pills for $1,000 at the same price ($2.50 per pill) as their prior deals. The two agreed to meet at the China Buffet in Methuen, a location that had been used for a prior buy.

Investigators met with CS-1 and prepared CS-1 for this controlled purchase in the manner described above.

27. At approximately 2:18 p.m., GARCIA contacted CS-1 via the Target Telephone number and stated that he was on his way to the China Buffet. GARCIA and CS-1 had two other contacts via the Target Telephone in the next 15 minutes, during one of which GARCIA told CS-1 that he had moved to the Dunkin Donuts because he saw a car he did not like at the China Buffet lot. Based on experience and training, I believed GARCIA was explaining that he changed the meeting location because he was afraid of being detected by law enforcement.

28. CS-1 and GARCIA met up at the Dunkin Donuts lot at approximately 2:40 p.m., at which time GARCIA entered CS-1's vehicle. I have reviewed the audio-video recording from CS-1's vehicle and the recording clearly shows GARCIA's face as he enters CS-1's vehicle to make the delivery of drugs that had been negotiated.

29. Based on a subsequent debriefing of CS-1 and as corroborated by the audio-video recording, once in the vehicle, GARCIA removed a plastic baggie from his pant pocket and handed it to CS-1, and CS-1 handed GARCIA the $1,000 in government funds that CS-1 had been provided to complete this transaction.

30. The bag that GARCIA personally delivered to CS-1 on June 10, 2024, was sent to a DEA drug laboratory for chemical analysis. The lab results showed that the bag contained approximately 396 pills, which weighed approximately 43.16 grams, and were found to contain fentanyl and p-fluorofentanyl.

**Conclusion**

31.     Based on the evidence set forth above, as well as my training, experience, and knowledge of this investigation, I submit that there is probable cause to believe that from in and about November 2013 through in and about June 2024, GARCIA, GOMEZ, ███, and others conspired to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.

I, Michael J. Dunn, hereby state under the penalties of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

_Michael Dunn_
MICHAEL J. DUNN
Special Agent, DEA

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 on April __1__, 2025.

_____
HON. DONALD L. CABELL
Chief United States Magistrate Judge
District of Massachusetts